UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

MAR-CAN TRANSPORTATION
COMPANY, INC.,

                              Plaintiff,            **OPINION & ORDER**

            - against -                             No. 20-CV-8743 (CS)

LOCAL 854 PENSION FUND,

                              Defendant.
------------------------------------------------------------x

<u>Appearances</u>:

Jennifer S. Smith
Law Offices of Jennifer Smith PLLC
New York, New York
*Counsel for Plaintiff*

Anusha Rasalingam
Leo Gertner
Friedman & Anspach
New York, New York

Stephen J. Mogila
Lauren Bonaguro
Mogila Law Group
New York, New York
*Counsel for Defendant*

<u>Seibel, J.</u>

        Before the Court is the motion of Defendant Local 854 Pension Fund ("Defendant" or the

"Old Plan"), (ECF No. 277), to stay the judgment dated May 6, 2024, (ECF No. 266), pending

the outcome of the Old Plan's appeal of that judgment and the corresponding March 22, 2024

opinion and order, (ECF No. 249 (the "March 22 Decision")), reported at *Mar-Can Transp. Co.,

Inc. v. Loc. 854 Pension Fund*, No. 20-CV-8743, 2024 WL 1250716 (S.D.N.Y. Mar. 22, 2024).

## I.    **BACKGROUND**

The pertinent facts and procedural history are discussed in full in the March 22 Decision that disposed of the motions for summary judgment of the Old Plan and of Plaintiff Mar-Can Transportation Company, Inc. ("Plaintiff" or "Mar-Can").  (ECF No. 249.)   I assume the parties' familiarity with the record, facts, procedural history and analysis as set forth in that decision.  On April 26, 2024, I conferred with the parties regarding entry of judgment and next steps, (*see* Minute Entry dated April 26, 2024), and on May 6, 2024, I entered a final judgment on the March 22 Decision, (ECF No. 266).  The judgment reads as follows:

> It is hereby ORDERED, ADJUDGED AND DECREED:  Judgment is hereby entered for Plaintiff on its claims under 29 U.S.C. § 1415 requiring Defendant to transfer pension assets and liabilities, as set forth in ECF Nos. 184 and 187, and requiring Defendant to reduce Plaintiff's withdrawal liability, as set forth in ECF No. 249.

(ECF No. 266.)  On May 21, 2024, the Old Plan filed its notice of appeal of that judgment, (ECF No. 275), and on May 29, 2024, Mar-Can filed its notice of cross-appeal, (ECF No. 276).[1]  The instant motion followed.[2]

---

[1] The Old Plan and Mar-Can originally filed their notices of appeal and cross-appeal of the March 22 Decision on April 19, 2024, (ECF No. 256), and May 3, 2024, (ECF No. 264), respectively.  On June 7, 2024, after both sides filed their notices of appeal and cross-appeal with respect to the May 6, 2024 judgment, the parties withdrew their original appeals.  (ECF No. 281.)

[2] While the Old Plan's motion, (ECF No. 277), seeks only a stay pending appeal and does not specify that the Old Plan also seeks to stay Mar-Can's application for attorneys' fees, both parties have briefed that issue, (*see* ECF No. 278 ("Old Plan's Mem.") at 10-12; ECF No. 284 ("Mar-Can's Opp.") at 17-20; ECF No. 286 ("Old Plan's Reply") at 10), and the Court does not see how considering it would prejudice Mar-Can.  Thus, the Court also considers that request.

II.     **LEGAL STANDARDS**

A.     **Stay Pending Appeal**

Stay applications to the District Court are governed by Federal Rule of Civil Procedure ("FRCP") 62.  *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Whitehaven S.F., LLC v. Spangler*, No. 13-CV-8476, 2014 WL 5510860, at *1 n.3 (S.D.N.Y. Oct. 31, 2014).  A stay pending appeal is "not a matter of right, even if irreparable injury might otherwise result," but rather is "a discretionary determination dependent on the specifics of the matter before the court."  *Leroy v. Hume*, 563 F. Supp. 3d 22, 25 (E.D.N.Y. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 433-34 (2009)); *see DiMartile v. Hochul*, 80 F.4th 443, 456 (2d Cir. 2023).[3]

"The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion," and under the traditional test, the court considers four factors to determine if that burden has been met:  "'(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'"  *Nken*, 556 U.S. at 433-34 (quoting *Hilton*, 481 U.S. at 776); *see U.S. S.E.C. v. Daspin*, 557 F. App'x 46, 47-48 (2d Cir. 2014) (summary order); *Leroy*, 563 F. Supp. 3d at 25-26; *Strougo v. Barclays PLC*, 194 F. Supp. 3d 230, 233 (S.D.N.Y. 2016); *Sutherland v. Ernst & Young LLP*, 856 F. Supp. 2d 638, 640 (S.D.N.Y. 2012).  "The degree to which a factor must be present varies with the strength of the others;" put another way, "more of one factor excuses less of the other."  *Daspin*, 557 F. App'x at 48; *see Strougo*, 194 F. Supp. 3d at 233 ("Courts have treated these factors like a sliding

---

[3] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

scale"). But the first two factors – the movant's likelihood of success on the merits and whether the movant will suffer irreparable injury absent a stay – are the "most critical" factors. *Nken*, 556 U.S. at 434; *see Daspin*, 557 F. App'x at 48; *Strougo*, 194 F. Supp. 3d at 233. The burden on the moving party to show that a stay is justified under the circumstances is a heavy one. *See Usherson v. Bandshell Artist Mgmt.*, No. 19-CV-6368, 2020 WL 4228754, at *1 (S.D.N.Y. July 22, 2020); *Vista Food Exch., Inc. v. Lawson Foods, LLC*, No. 17-CV-7454, 2019 WL 6498068, at *1 (S.D.N.Y. Dec. 3, 2019).

FRCP 62 also permits a party to "obtain a stay by providing a bond or other security." Fed. R. Civ. P. 62(b). "The stay takes effect when the court approves the bond or other security and remains in effect for the time specified in the bond or other security." *Id.* The purpose of the bond requirement in FRCP 62(b) is twofold: "to ensure that the prevailing party will recover in full, if the decision should be affirmed, while protecting the other side against the risk that payment cannot be recouped if the decision should be reversed." *In re Nassau Cnty. Strip Search Cases*, 783 F.3d 414, 417 (2d Cir. 2015) (*per curiam*). The Court may exercise its discretion to waive the bond requirement "if the appellant provides an acceptable alternative means of securing the judgment." *Id.*; *see Sire Spirits, LLC v. Green*, No. 21-CV-7343, 2023 WL 1516574, at *1 (S.D.N.Y. Feb. 3, 2023). In assessing whether the bond requirement should be waived and "other security" proposed by the appellant accepted, the Second Circuit has identified the following factors:

> (1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and (5) whether the defendant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the defendant in an insecure position.

4

*Nassau*, 783 F.3d at 417-18; *see In re Bakery & Confectionery Union & Indus. Int'l Pension Fund Pension Plan*, No. 11-CV-1471, 2013 WL 12444540, at *2 (S.D.N.Y. Jan. 29, 2013) (considering similar factors). The Second Circuit has concluded that these factors, rather than the traditional stay factors under *Hilton*, "more directly address the primary purpose of Rule 62[b]."[4] *Nassau*, 783 F.3d. at 418; *see EMA Fin., LLC v. Joey New York Inc.,* No. 17-CV-9706, 2022 WL 2399754, at *2 (S.D.N.Y. July 1, 2022) ("The traditional four-factor test often used in connection with stays of injunctions . . . applies only when the judgment sought to be stayed is for injunctive or equitable relief."); *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 649 (S.D.N.Y. 2018) (traditional four-factor stay test applies "only when the judgment sought to be stayed is for injunctive or equitable relief") (collecting cases).

### B.    Stay of Attorneys' Fees Application

"[N]otwithstanding a pending appeal, a district court retains residual jurisdiction over collateral matters, including claims for attorneys' fees." *Tancredi v. Metro. Life Ins. Co.*, 378 F.3d 220, 225 (2d Cir. 2004). "'If an appeal on the merits of the case is taken, the court may rule on the claim for fees, may defer its ruling on the motion, or may deny the motion without prejudice, directing under subdivision (d)(2)(B) a new period for filing after the appeal has been resolved.'" *Topps Co., Inc. v. Koko's Confectionary & Novelty*, No. 16-CV-5954, 2020 WL 6082093, at *2 (S.D.N.Y. Oct. 15, 2020) (quoting Fed. R. Civ. P. 54(d)(2) Advisory Committee's Note (1993)); *see Tancredi*, 378 F.3d at 225-26 (same); *Barrella v. Vill. of Freeport*, 56 F. Supp. 3d 169, 172-73 (E.D.N.Y. 2014) ("[W]here the losing party takes an

---

[4] "Rule 62(b) was formerly Rule 62(d)." *Georgiev v. Adsad, LLC*, No. 19-CV-122, 2021 WL 3159853, at *1 n.1 (S.D.N.Y. June 21, 2021).

appeal on the merits of [a] case, the district court has the discretion to defer ruling on the prevailing party's motion for attorney[s'] fees.").

## III.    DISCUSSION

### A.    Statutory Framework and the March 22, 2024 Decision

#### 1.    ERISA's Statutory Framework

I assume the parties' familiarity with the statutory framework of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001 *et seq*.,[5] and the Multiemployer Pension Plan Amendments Act ("MPPAA"), which I discussed at length in the March 22 Decision, *see Mar-Can*, 2024 WL 1250716, at *1-3, *6-8.  I incorporate that discussion here and expand on it as relevant.

As explained in the March 22 Decision, Part 1 of Subtitle E of ERISA, 29 U.S.C. §§ 1381-1405, governs withdrawal liability, applying "[i]f an employer withdraws from a multiemployer plan."  *See* 2024 WL 1250716, at *7.  It provides a complex scheme for calculating an employer's withdrawal liability.  *See Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 196-97 (1997); *Iron Workers Dist. Council of S. Ohio & Vicinity Pension Fund v. Lykins Reinforcing, Inc.*, 484 F. Supp. 3d 544, 548 (S.D. Ohio 2020).  Once an employer withdraws from a pension plan, § 1382 directs the plan sponsor to "(1) determine the amount of the employer's withdrawal liability, (2) notify the employer of the amount of the withdrawal liability, and (3) collect the amount of the withdrawal liability from the employer."  29 U.S.C. § 1382; *see Bay Area*, 522 U.S. at 197 ("The Act does not call upon the employer to propose the amount of withdrawal liability.  Rather, it places the calculation burden on the plan's trustees."); *T.I.M.E.-DC v. Mgmt.-Lab. Welfare & Pension Funds, of Loc. 1730*,

---

[5] The Court refers to ERISA sections by their numbering in Title 29 of the U.S. Code.

756 F.2d 939, 946 (2d Cir. 1985) ("Once the employer withdraws from the plan, it becomes the

plan sponsor's duty to calculate the amount of withdrawal liability.").  After the plan sponsor

determines the amount of the employer's withdrawal liability, it must then "(A) notify the

employer of (i) the amount of the liability, and (ii) the schedule for liability payments, and (B)

demand payment in accordance with the schedule."  29 U.S.C. § 1399(b)(1).  "The most

significant aspect of the notice scheme is that no matter what disputes arise between the old plan

sponsor and the employer over the amount of [withdrawal] liability, the employer is obligated to

pay the withdrawal liability demanded as soon as the plan sponsor has provided notice of the

payment schedule under § 1399(b)(1)."  *T.I.M.E.-DC*, 756 F.2d at 946.

Section 1399(b)(2)(A) provides an informal review process under which the employer

may, within ninety days after receiving the notice described in § 1399(b)(1), challenge the plan

sponsor's determination of the employer's withdrawal liability and payment schedule.  *See Bay

Area*, 522 U.S. at 197; *Bowers for & on Behalf of NYSA-ILA Pension Tr. Fund v. Transportes

Navieros Ecuadorianos (Transnave)*, 719 F. Supp. 166, 173 (S.D.N.Y. 1989).  Once the plan

sponsor has conducted a "reasonable review of any matter raised," the sponsor must notify the

employer of its decision, its reasoning, and any changes made to the employer's withdrawal

liability or schedule of payments.  29 U.S.C. § 1399(b)(2)(B); *see Bakery & Confectionery

Union & Indus. Int'l Pension Fund v. Zaro Bake Shop, Inc.*, No. 20-CV-9894, 2021 WL

2350094, at *3 (S.D.N.Y. June 8, 2021).  Any further disputes "between an employer and the

plan sponsor of a multiemployer plan concerning a determination made under sections 1381

through 1399 of [Title 29] shall be resolved through arbitration."  29 U.S.C. § 1401(a)(1); *see

Bay Area*, 522 U.S. at 197 (employer may "invoke a dispute-resolution procedure that involves .

. . ultimately, arbitration") (citing 29 U.S.C. § 1401(a)(1)); *T.I.M.E.-DC*, 756 F.2d at 944

("Section 1401 provides for arbitration to resolve disputes over the amount of the withdrawal liability.").  Under § 1401(a)(1), either party may initiate arbitration within sixty days of the earlier of "(A) the date of notification to the employer under section 1399(b)(2)(B) of this title, or (B) 120 days after the date of the employer's request under section 1399(b)(2)(A) of this title."  29 U.S.C. § 1401(a)(1).  The parties may also jointly initiate arbitration within 180 days of the plan sponsor's § 1399(b)(1) demand.  *Id.*  If neither party initiates arbitration under § 1401(a), then the amount demanded under § 1399(b)(1) must be paid by the employer in accordance with the payment schedule set by the plan sponsor.  29 U.S.C. § 1401(b)(1).

The obligation to continue withdrawal liability payments regardless of a dispute as to the amount or the schedule is set forth in § 1399(c)(2), which reads as follows:  "Withdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor under subsection (b)(1) beginning no later than 60 days after the date of the demand notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule."  29 U.S.C. § 1399(c)(2).  Section 1401(d) likewise directs:

> Payments shall be made by an employer in accordance with the determinations made under this part until the arbitrator issues a final decision with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination.

29 U.S.C. § 1401(d).  These provisions have been characterized as ERISA's "pay now, dispute later" procedure.  *See Bay Area*, 522 U.S. at 197 ("Even if the employer challenges the trustees' withdrawal liability determination, however, it still must pay according to the trustees' schedule in the interim under the statute's 'pay now, dispute later' collection procedure."); *T.I.M.E.-DC*, 756 F.2d at 946-47 (employer obligated to make payments during "the review and appeal period" under § 1399(c)(2)); *Iron Workers*, 484 F. Supp. 3d at 549 (ERISA's "pay now, dispute

later" procedure established by sections 1399(c)(2) and 1401(d)); *JLNW, Inc. v. Nat'l Ret. Fund*, No. 17-CV-5095, 2019 WL 4688690, at *4 (S.D.N.Y. Sept. 25, 2019) (to the same effect). "The 'pay now, dispute later' [procedure] is intended to address and to alleviate the risk that during the course of arbitration, an employer will become insolvent, and the fund will not be able to collect in the event of a favorable award." *Bakery & Confectionery*, 2021 WL 2350094, at *3; *see Trs. of IAM Nat'l Pension Fund v. M&K Emp. Sols., LLC*, 694 F. Supp. 3d 54, 68 (D.D.C. 2023) (to the same effect).

As detailed in the March 22 Decision, Part 2 of Subtitle E of ERISA, 29 U.S.C. §§ 1411-1415, governs "merger or transfer of plan assets or liabilities." 2024 WL 1250716, at *7. When "an employer has completely or partially withdrawn from a multiemployer plan . . . as a result of a certified change of collective bargaining representative," § 1415(a) mandates "that the old plan transfer liabilities and assets to the new plan 'in accordance with [§ 1415].'" *Mar-Can*, 2024 WL 1250716, at *8 (quoting 29 U.S.C. § 1415(a)). Section 1415 "requires that notice be given and sets forth procedures for transferring assets and liabilities from the old to the new plan." *T.I.M.E.-DC*, 756 F.2d at 944; *see* 29 U.S.C. § 1415(b), (g). "Upon completion of a transfer of the appropriate amount of assets and liabilities, Section 1415(c) requires a reduction of the employer's withdrawal liability with respect to the old plan." *Mar-Can*, 2024 WL 1250716, at *8. Section 1415(c) reads as follows:

> (c) **Reduction of amount of withdrawal liability of employer upon transfer of appropriate amount of assets and liabilities by plan sponsor of old plan to new plan**
> If the plan sponsor of the old plan transfers the appropriate amount of assets and liabilities under this section to the new plan, then the amount of the employer's withdrawal liability (as determined under section 1381(b) of this title without regard to such transfer and this section) with respect to the old plan shall be reduced by the amount by which–

(**1**) the value of the unfunded vested benefits allocable to the employer which were transferred by the plan sponsor of the old plan to the new plan, exceeds

(**2**) the value of the assets transferred.

29 U.S.C. § 1415(c).

### 2.    Application of the March 22 Decision

In the March 22 Decision, I interpreted § 1415 and the surrounding statutory framework, determining how a plan sponsor must apply the § 1415(c) reduction to a withdrawing employer's withdrawal liability with respect to an old plan in connection with a § 1415 transfer.  *See Mar-Can*, 2024 WL 1250716, at *8-15.  I concluded that, for purposes of § 1415(c), "unfunded vested benefits allocable to the employer" means the total amount of unfunded liabilities transferred, *see Mar-Can*, 2024 WL 1250716, at *10-11, and as a result, "under Section 1415(c), to determine the reduction to an employer's withdrawal liability to the old plan, the value of the transferred assets is subtracted from the value of the total transferred liabilities," *id.* at *11.[6]  I thus resolved the remaining legal dispute between Mar-Can and the Old Plan regarding the § 1415(c) reduction in this case.  As the Old Plan executed the § 1415 transfer of pension assets and liabilities to the ATW Fund (the "New Plan"), *see Mar-Can*, 2024 WL 1250716, at *2-3, the remaining task is for the Old Plan to calculate and apply the § 1415(c) reduction to Mar-Can's withdrawal liability as to the Old Plan.  Once that § 1415(c) reduction is applied, the parties will calculate Mar-Can's overpayments.

The Old Plan contends that the MPPAA requires the Court to continue holding Mar-Can's interim payments in escrow pending the Second Circuit's disposition of the pending appeal.  (*See* Old Plan's Mem. at 4.)  Specifically, the Old Plan argues that "the statute itself

---

[6]  This calculation usually means that the employer's withdrawal liability is reduced to zero as a result of a § 1415 transfer.  *Mar-Can*, 2024 WL 1250716, at *10-12.

requires that an employer make interim withdrawal liability payments regardless of whether there is a dispute, including disputes that are appealed." (*Id.* at 5; *see* Old Plan's Reply at 5-6.) This contention is misplaced. To be sure, the March 22 Decision does not expressly state that Mar-Can is entitled to a refund of the withdrawal liability payments demanded by the Old Plan and placed in escrow with the Court. But the March 22 Decision and the operation of the relevant statutes and regulations require that result. Under § 1415, once Mar-Can and the Old Plan satisfied their notice requirements under § 1415(b), *see Mar-Can*, 2024 WL 1250716, at *2, the remaining provisions of § 1415 – including the determination of the amount of assets and liabilities to transfer between the plans, and the transfer itself – were triggered, *see T.I.M.E.-DC*, 756 F.2d at 948. Once "the appropriate amount of assets and liabilities under [§ 1415]" are transferred from the Old Plan to the New Plan, § 1415(c)'s plain language directs the Old Plan to apply the statutory reduction to Mar-Can's withdrawal liability with respect to the Old Plan. 29 U.S.C. § 1415(c) ("If the plan sponsor of the old plan transfers the appropriate amount of assets and liabilities under this section to the new plan, then the amount of the employer's withdrawal liability . . . with respect to the old plan *shall be reduced . . .*") (emphasis added). Because, as the Court understands it, that reduction results in an assessment of $0 withdrawal liability with respect to the Old Plan, Mar-Can has overpaid.[7]

　　　Regarding withdrawal liability overpayments, 29 C.F.R. § 4219.31(d) states:

---

[7] According to the March 22 Decision, Mar-Can's withdrawal liability would be reduced to $0 after the Old Plan applies the § 1415(c) reduction, based on the undisputed values for the assets transferred ($3.7 million), the transferred liabilities ($5.5 million), and the initial assessment of Mar-Can's withdrawal liability, ($1.8 million). *See Mar-Can*, 2024 WL 1250716, at *8; *id.* at *2 n.6. On April 11, 2024, the parties submitted a letter to the Court stating that the March 22 Decision "resolv[ed] all substantive matters in the litigation other than Plaintiff's request for attorneys' fees." (ECF No. 254 at 1.) I thus have no reason to believe that the § 1415(c) reduction applied to Mar-Can would result in withdrawal liability greater than $0 with respect to the Old Plan.

> (d) Overpayments.  If the plan sponsor or an arbitrator determines that payments made in accordance with the schedule of payments established by the plan sponsor have resulted in an overpayment of withdrawal liability, the plan sponsor shall refund the overpayment, with interest, in a lump sum. The plan sponsor shall credit interest on the overpayment from the date of the overpayment to the date on which the overpayment is refunded to the employer at the same rate as the rate for overdue withdrawal liability payments, as established under § 4219.32 or by the plan pursuant to § 4219.33.

29 C.F.R. § 4219.31(d); *see T.I.M.E.-DC*, 756 F.2d at 947 ("The employer can also put its withdrawal liability into an escrow account, or pay the plan sponsor on time and get back any overpayment with interest.").  The old plan's required calculation of the § 1415(c) post-transfer reduction constitutes a "determin[ation]" by the "plan sponsor" that "payments made in accordance with the schedule of payments established by the plan sponsor have resulted in an overpayment of withdrawal liability," and therefore the plan sponsor is required to "refund the overpayment, with interest, in a lump sum."  29 C.F.R. § 4129.31(d).

Thus, here, under the March 22 Decision the Old Plan is obligated to calculate the reduction that follows the transfer, which in turn drives the calculation of the amount of the overpayment by Mar-Can – a "determin[ation]" by the "plan sponsor" requiring it to refund the overpayment (even if that determination results from application of a court decision interpreting § 1415 with which the Old Plan disagrees).

Mar-Can's initial assessed withdrawal liability with respect to the Old Plan was $1,798,978.  *See Mar-Can*, 2024 WL 1250716, at *1.  Because application of the § 1415(c) reduction reduces that withdrawal liability to $0, any payment that Mar-Can made in accordance with the Old Plan's payment schedule is necessarily an "overpayment" and – had Mar-Can paid the Old Plan directly – those payments would have had to be refunded by the Old Plan, with interest.  *See GCIU-Emp. Ret. Fund v. WestRock Co.*, No. 21-CV-8070, 2023 WL 3402617, at *6 (C.D. Cal. Mar. 10, 2023) ("[T]he court notes that when courts have ordered multiemployer

pension plans to remit withdrawal liability overpayments with interest pursuant to 29 C.F.R. § 4219.31(d), the final *net* withdrawal liability calculation indicated the employer had overpaid.") (emphasis in original) (collecting cases); *Iron Workers*, 484 F. Supp. 3d at 550 ("Along the same lines, even if an arbitrator does not find in the employer's favor, if the employer has over-paid the money it owes, then 'the plan sponsor shall refund the overpayment, with interest, in a lump sum.'") (quoting 29 C.F.R. § 4219.31(d)); *see also Trs. of Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Cen. Transp., Inc.*, 935 F.2d 114, 118-19 (7th Cir. 1991) ("[F]unds will be able to repay any withdrawal liability that a court or arbitrator ultimately determines they should not have collected.").

Because Mar-Can chose to submit its payments into escrow – in this case, ultimately paid to the Court's Registry, *see Mar-Can*, 2024 WL 1250716, at *1 – as an alternative to paying the Old Plan directly, *see T.I.M.E.-DC*, 756 F.2d at 947, the Old Plan never received the overpayments. But these principles still stand, and the March 22 Decision requires the escrowed funds to be returned to Mar-Can.

The Old Plan disagrees, contending that § 1399(c)(2)'s plain language requires an employer to "make its interim withdrawal liability payments" – or in this case, for the employer to maintain its withdrawal liability payments in escrow – during the pendency of an appeal to a federal court, and thus the overpayment in escrow should not be returned until such time (if ever) that its appeal of the March 22 Decision and the corresponding judgment is completed without success. (Old Plan's Mem. at 5-7; Old Plan's Reply at 4-6.) For several reasons, I disagree that that section's reference to "appeal" means appeal to the Court of Appeals (and then the Supreme Court) from a District Court decision.

First, in *T.I.M.E.-DC* the Second Circuit interpreted the terms "review" and "appeal" in

§ 1399(c)(2) and concluded as follows:

> When [§ 1399(c)(2)] refers to "review" it means the informal review process
> outlined in § 1399(b)(2)(A) under which the employer, no later than 90 days after
> it receives the plan sponsor's § 1399(b)(1) notice, may ask the plan sponsor to
> review the determination to correct any inaccuracy.  Section 1399(b)(2)(B) directs
> the plan sponsor to respond to the employer's request "after a reasonable review
> of any matter raised."  The "appeal" refers to the formal arbitration proceedings
> provided for in § 1401.  ("Payments shall be made by an employer in accordance
> with the determinations made under this part until the arbitrator issues a final
> decision with respect to the determination submitted for arbitration, with any
> necessary adjustments in subsequent payments for overpayments or
> underpayments arising out of the decision of the arbitrator with respect to the
> determination.").

*T.I.M.E.-DC*, 756 F.2d at 946 n.1; *see Greater Pa. Carpenter's Pension Fund v. Novinger's, Inc.*,

No. 14-CV-956, 2015 WL 5691093, at *3 (W.D. Pa. 2015) ("'Appeal' refers to the formal

arbitration proceedings provided for in § 1401.  There is no indication that Congress intended for

review or appeal to apply to a litigant's resort to the federal courts following an arbitrator's final

decision, thus prolonging [the fund's] entitlement to interim withdrawal payments indefinitely.

Such an interpretation would directly conflict with the plain wording of § 1401(d):  '[p]ayments

shall be made by an employer . . . until the *arbitrator* issues a final decision.'") (emphasis in

original).[8]  Here, the dispute involved statutory interpretation of § 1415(c) – a provision outside

---

[8] The Old Plan contends that the Second Circuit's interpretation of § 1399(c)(2)'s scope
is dictum.  (*See* Old Plan's Mem. at 6.).  I disagree.  In *T.I.M.E.-DC*, the Second Circuit
addressed whether compliance with § 1415's notice and transfer requirements was a condition
precedent to the employer's payment of withdrawal liability.  *See* 756 F.2d at 945.  The Circuit
concluded that ERISA contained no such requirement and that § 1415's transfer provisions did
not alter Congress's aim of requiring interim payments once a plan sponsor issues a
§ 1399(b)(1)(B) demand.  *See id.* at 947 ("Compliance with § 1415 is not . . . a precondition to
the payment of withdrawal liability.").  The Second Circuit interpreted § 1399(c)(2)'s "review or
appeal" language as part of its analysis of the interplay between § 1399, § 1401 and § 1415.  *See
id.* at 945-47.  But even if that discussion were dictum, the Court may still consider it as
indicative of the Second Circuit's view of § 1399(c)(2).  *See United States v. Rare Breed*

the scope of mandatory arbitration under § 1401(a). *See T.I.M.E.-DC*, 756 F.2d at 945 ("[T]here

is no indication that Congress contemplated that § 1401(a)(1) would empower an arbitrator to

make decisions outside the context of sections 1381 through 1399."). "The issue here involves

---

*Triggers, LLC*, 690 F. Supp. 3d 51, 79 (E.D.N.Y. 2023) ("[I]nterpretations of law from an appellate court . . . even if technically dicta, are entitled to persuasive weight by a district court in the absence of other, binding interpretations of the same law."); *Kivo v. Blumberg Exelsior, Inc.*, 982 F. Supp. 2d 217, 223-24 (E.D.N.Y. 2013) (judicial dictum "where the Court is providing a construction of a statute to guide" future courts is "generally entitled to greater weight").

The Old Plan relies on *Robbins v. Pepsi-Cola Metro. Bottling Co.*, 637 F. Supp. 1014 (N.D. Ill. 1986), *aff'd*, 800 F.2d 641 (7th Cir. 1986), (*see* Old Plan's Mem. at 5-6), which denied an employer's motion to stay its payment obligation pending appeal by posting a bond pursuant to FRCP 62. Relying primarily on the need for the fund to receive a consistent flow of payments, it interpreted § 1399(c)(2)'s "pay now, dispute later" command to apply to appeals to courts, not just to an arbitrator. *Robbins*, 637 F. Supp. at 1017-18. But it is dubious that this analysis applies when it is the Old Plan that would be posting the bond – particularly as it is the New Plan that is responsible for the unfunded liabilities associated with Mar-Can's employees. In any event, this out-of-Circuit case is not binding, and I find its interpretation unpersuasive for the reasons set forth in the text.

The Old Plan also relies on *Korea Shipping Corp. v. N.Y. Shipping Ass'n-Int'l Longshoremen's Ass'n Pension Tr. Fund*, 663 F. Supp. 766 (S.D.N.Y. 1987), and *Korea Shipping Corp. v. New York Shipping Ass'n*, 811 F.2d 124 (2d Cir. 1987). But these decisions are not contrary to my analysis. In *Korea Shipping*, the defendant had assessed withdrawal liability as to plaintiff and presented it with a payment schedule, after which plaintiff responded with a request for reconsideration and ultimately commenced an action seeking declaratory judgment that it was not an employer subject to withdrawal liability under the MPPAA. *See* 663 F. Supp. at 766-67. The district court ordered that plaintiff make its withdrawal liability payments, and subsequently ordered the payments to be made into escrow, "pending final disposition of plaintiff's claim that it is not an 'employer' under the MPPAA." *Id.* at 767 n.2. The defendant then moved for summary judgment dismissing plaintiff's declaratory judgment claim and for judgment on defendant's counterclaim for the amount of the alleged withdrawal liability. *See id.* at 766. The court granted in part and denied in part the defendant's motion for summary judgment "without prejudice to renewal upon completion of pretrial discovery." *Id.* at 773. While the Second Circuit reviewed the parties' interlocutory appeals of the payment orders, the district court was considering the parties' renewed cross-motions for summary judgment after the completion of discovery. *See Korea Shipping*, 811 F.2d at 125. As the Second Circuit made clear in its description of the district court proceedings, there had not yet been a final disposition on the merits by the district court, *see id* at 125-127, unlike here. Thus, these cases simply confirm the Second Circuit's conclusion in *T.I.M.E.-DC* that escrow payments may be an alternative to paying the pension plan directly under the "pay now, dispute later" procedure. *See* 756 F.2d at 947. They do not suggest that the "pay now" obligation continues during an appeal from a final district court decision.

the interaction of § 1415 with the withdrawal liability provisions and, as such, is outside the scope of those issues that Congress directed to the arbitrator." *Id.*; *see Iron Workers*, 484 F. Supp. 3d at 551 ("[T]he provision requiring arbitration as the exclusive form of dispute resolution refers only to 'determination[s] made under sections 1381 through 1399 of this title.'").  Because the interpretation of § 1415(c)'s reduction obligation was not subject to arbitration under § 1401(a), there is no current "appeal" as contemplated by § 1399(c)(2).  *See T.I.M.E.-DC*, 756 F.2d at 946 n.1.[9]

The Second Circuit's interpretation of the term "appeal" referring to § 1401 arbitration proceedings makes sense when considering the function of § 1399(c)(2) in light of § 1399(b)(1)'s notice requirements.  In *T.I.M.E.-DC*, the Circuit explained that "[t]he most significant aspect of the notice scheme is that no matter what disputes arise between the old plan sponsor and the employer over the amount of liability, the employer is obligated to pay the withdrawal liability demanded as soon as the plan sponsor has provided notice of the payment schedule under § 1399(b)(1)."  756 F.2d. at 946.  Section 1399(c)(2) clarifies that this obligation of the employer – to "pay now" upon receipt of the pension plan's demand – continues notwithstanding any dispute about the amount of the withdrawal liability or the payment

_____

[9] The Old Plan arguably makes this point in its discussion of § 1401(d), which provides that an employer's payments made in accordance with a determination under Part 1 shall continue "until the arbitrator issues a final decision with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination."  29 U.S.C. § 1401(d).  There was no arbitration decision regarding the § 1415(c) dispute in this case, as the Court addressed it in the first instance, and the Old Plan contends that this provision is therefore inapplicable.  (*See* Old Plan's Mem. at 7.)  But if § 1401(d) does not apply because there is no arbitration, and under *T.I.M.E.-DC* the term "appeal" in § 1399(c)(2) refers to the arbitration procedures set forth in § 1401, then it follows that there is no "appeal" requiring continued payments by Mar-Can.

schedule. *See id.* ("Congress made the requirement that the employer promptly pay its withdrawal liability obligations crystal clear in § 1399(c)(2).").  The Circuit further concluded that the interplay between § 1415 and § 1399 does not alter Congress's aim to require an employer to begin paying withdrawal liability in accordance with a § 1399(b)(1)(B) demand. *See id.* at 947-48.  This makes sense because the *amount* of an employer's withdrawal liability to the old plan is a necessary variable in the calculation of both the "appropriate amount of assets" to transfer under § 1415(g) and the § 1415(c) reduction. *See* 29 U.S.C. §§ 1415(c) (using the withdrawal liability "determined under section 1381(b)"), (g) (same).  By disputing the amount of assets and liabilities to transfer, the employer or new plan is effectively also disputing the *amount* of the withdrawal liability – precisely what § 1399(c)(2) covers.  In other words, "the fact that the new plan or the employer disputes the amount that the old plan proposes to transfer [under § 1415] does not relieve the employer of its obligation to pay the withdrawal liability according to the payment schedule set by the sponsors of the old plan." *T.I.M.E.-DC,* 756 F.2d. at 947.

At the same time, § 1415(c)'s reduction is not a determination of the *amount* of withdrawal liability:  it is a separate reduction that occurs in the specific circumstances of a § 1415 transfer that is found in a different part of the MPPAA and is not a dispute falling under § 1399(c)(2)'s review procedures or § 1401(a)'s arbitration procedures. *See United Food & Com. Workers Union-Emp. Pension Fund v. Rubber Assocs.*, No. 14-CV-183, 2015 WL 778781, at *5 (N.D. Ohio Feb. 24, 2015) (identifying § 1415 as one of ERISA's "specific exceptions that reduce or eliminate withdrawal liability in certain circumstances"), *aff'd*, 812 F.3d 521 (6th Cir. 2016). *T.I.M.E.-DC* explained that "[o]nce the [Old Plan] provides th[e required] notice, this event will trigger the other provisions of § 1415, and the parties should be able to agree on the

amount of assets and liabilities that the old plan should transfer to the new plan.  At the same time, the employer may pursue its arbitration rights under § 1401 if it disputes other aspects of the withdrawal liability calculation."  756 F.2d at 948.  Those "other aspects" refer to the determinations required to calculate the amount of withdrawal liability (or its payment schedule) – in other words, determinations made under Part 1.[10]  Therefore, while § 1415 is not subject to the "pay now, dispute later" procedures of Part 1, it works in tandem and does not interfere with that process.

---

[10] The Old Plan highlights that in *Korea Shipping*, 663 F. Supp. at 767, the pay-now procedure applied to a dispute not strictly about the amount of withdrawal liability or the schedule of payments – that is, the dispute over whether plaintiff was an "employer" under the MPPAA and therefore subject to withdrawal liability in the first place.  (*See* Old Plan's Reply at 4.)  The district court analyzed whether Korea Shipping fit within that term as used in § 1381(a) and § 1383(a), ultimately concluding that it did, *see* 663 F. Supp. at 770-72, and required it to make withdrawal liability payments in the meantime, *see id.* at 767 & n.2.  That makes sense: both § 1381 and §1383 fall within Part 1, and disputes about determinations under those sections are subject to § 1401(a)'s mandatory arbitration provision and therefore § 1401(d)'s "pay now" mandate (even though not arbitrated in that case).  The determination in *Korea Shipping* – which was essentially whether the old plan could impose an amount of withdrawal liability at all – fits more comfortably under § 1399(c)(2) than the interpretation of § 1415 (which falls within Part 2) undertaken by the Court in this case.  In any event, one cannot read too much into *Korea Shipping*'s order for interim payments, as the case does not discuss the reasoning behind that requirement.

Indeed, "[n]o case seems to have addressed squarely whether interim payments are required when a party that is assessed withdrawal liability brings an action in court for a declaratory judgment that it is not an 'employer' and is not required to arbitrate."  2 Employee Benefits Guide § 32.07(3)(e) (2024).  And that scenario raises the question whether "courts should enforce an interim payment requirement that presumes the existence of an arbitrable dispute."  *Id.*  But that question is not before me, and the fact that the *Korea Shipping* district court found that § 1399(c)(2) required those payments during that ongoing dispute appears reasonable under those facts and in line with this opinion.  Moreover, while the court granted summary judgment on the status of Korea Shipping as an employer under the MPPAA, it left open, among others, the question of whether Korea Shipping had waived its right to arbitrate "the existence and amount of its alleged withdrawal liability."  *See* 663 F. Supp. at 773.  That open dispute – whether the employer was permitted to initiate arbitration under § 1401 to challenge the withdrawal liability determination – clearly falls under § 1399(c)(2)'s continued payment command, in accordance with *T.I.M.E.-DC*.

Next, § 1415(d)'s structure supports this reading.  Where an employer must begin making withdrawal liability payments in accordance with § 1399, and the new plan appeals to the Pension Benefit Guaranty Corporation ("PBGC") to object to the proposed transfer of assets and liabilities, the employer must submit its payments into escrow while that appeal is pending.  *See* 29 U.S.C. § 1415(d).  If the transfer is executed, the funds paid into escrow are returned to the employer; if not, the escrowed amounts are paid to the old plan and credited against the employer's withdrawal liability.  *See id.*  This is logical:  to execute the transfer, there must be a determined amount of withdrawal liability to calculate the appropriate amount of assets under § 1415(g), and once the transfer occurs, to calculate and apply the § 1415(c) reduction to that withdrawal liability.  If there is a transfer that essentially erases the need for withdrawal liability payments, the funds go back to the employer.  But if there is no transfer, those funds are sent back to the old plan and credited against the employer's withdrawal liability as determined under Part 1.  Importantly, § 1415(d) directs the refund to the employer if the transfer is executed and payment to the old plan with credit toward the employer's withdrawal liability if the transfer is not executed; it does not allow for the funds to remain in escrow pending an appeal to the district court.  Yet accepting the Old Plan's view of § 1399(c)(2) conflicts with § 1415(d)'s plain language.  If the Old Plan's interpretation were correct, there would be no disbursement of any interim withdrawal liability payments until all appeals before federal courts were decided.  It is hard to square that interpretation with § 1415(d)'s command that withdrawal liability payments must be returned to the employer once a § 1415 transfer occurs, if the other conditions of § 1415(d) have been met.[11]  Further, it hardly makes sense that Congress would have wanted the

---

[11] At the same time, I disagree with Mar-Can's arguments regarding § 1415(d).  It contends that § 1415(d) controls here and requires return of Mar-Can's escrowed payments once

interim payments to be either refunded or applied only where a new plan appeals to the PBGC but not where an employer seeks relief in the district court.

Finally, this interpretation is supported by the statutory purpose behind the "pay now, dispute later" procedure – that is, "to alleviate the risk that *during the course of arbitration*, an employer will become insolvent, and the fund will not be able to collect in the event of a favorable award." *Findlay Truck Line, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 726 F.3d 738, 741-42 (6th Cir. 2013) (emphasis added); *see Bakery & Confectionery*, 2021 WL 2350094, at *3 (quoting *Findlay*); *see also ILGWU Nat. Ret. Fund v. Levy Bros. Frocks*, 846 F.2d 879, 881-82 (2d Cir. 1988) ("Moreover, during the pendency of *any arbitration proceedings*, payments must still be made in accordance with the sponsor's determination, with any subsequent adjustments to occur after the arbitrator's final decision.") (emphasis added); *Iron Workers*, 484 F. Supp. 3d at 550 ("It is true the employer must continue making interim payments *until the arbitrator* issues a final decision.") (emphasis added); *cf. Greater Pa. Carpenter's*, 2015 WL 5691093, at *3 ("[A]n interpretation [like the Old Plan proposes] would directly conflict with the plain wording of § 1401(d): 'payments shall be made by an employer

---

the Old Plan executed the § 1415 transfer.  (*See* Mar-Can's Opp. at 2, 8-9.)  Moreover, Mar-Can argues that "[t]he Second Circuit [in *T.I.M.E.-D.C.*] extended Section 1415(d)'s escrow provisions to all Section 1415 cases, not just appeals to the PBGC."  (*Id.* at 2 n.1.)  First, I disagree that § 1415(d) controls here – the statute's plain language specifies that the escrow provisions apply only if two provisions are met:  (1) the new plan must appeal the § 1415 transfer to the PBGC and (2) the employer must be making payments of withdrawal liability as required by § 1399.  *See* 29 U.S.C. § 1415(d)(1), (2).  There is no suggestion that the New Plan filed an appeal to prevent the § 1415 transfer here, and thus § 1415(d) is not controlling on this issue.  Second, there is no indication that *T.I.M.E.-DC* extended the escrow provisions of § 1415(d) to all § 1415 transfers.  Rather, the Second Circuit simply explained that voluntarily putting withdrawal liability payments into an escrow account could be an alternative to paying the plan sponsor directly under the "pay now, dispute later" procedure.  *See* 756 F.2d at 947 ("The PBGC has ameliorated the potential harshness of this pay-first-question-later system . . . . The employer can also put its withdrawal liability into an escrow account, or pay the plan sponsor on time and get back any overpayment with interest.").

until the arbitrator issues a final decision.'").  As there are no pending arbitration proceedings

here, and the issue regarding § 1415(c) has been resolved by the Court's final March 22

Decision, the purposes behind the MPPAA's "pay now, dispute later" procedure have been

served.  *See Bay Area*, 522 U.S. at 197 (describing "pay now, dispute later" procedure as the

dispute resolution that ends with "ultimately, arbitration"); *see also* 2 Employee Benefits Guide

§ 32.07(3)(e) (2024) ("The obligation to make interim payments extends only until the arbitrator

renders a decision.  After that, the employer must pay (or not pay) in accordance with the

arbitration award.").  Nothing in the statutes indicates that Congress intended that interim

withdrawal liability payments would continue in arbitration only until the arbitrator issues a final

decision, but would continue indefinitely if a district court were to issue a final decision instead.

That the Court resolved this dispute does not make it any less final.  *See* FRCP 62 (unless

appealing party posts bond or court orders otherwise, execution and enforcement of a judgment

may begin 30 days after its entry); *Harnage v. Santiago*, No. 16-CV-1880, 2017 WL 1005767, at

*2 (D. Conn. Mar. 13, 2017) ("Without a specific stay, judgments are effective as soon as they

are entered, notwithstanding any appeal that may have been filed.").  The Old Plan provides no

persuasive authority suggesting otherwise.

Thus, once the § 1415(c) reduction calculations are complete, Mar-Can is entitled, by

operation of law, to refund of its overpayments that are currently held in escrow with the Court's

Registry.

B.      **Stay Pending Appeal**

Having rejected the Old Plan's argument that the MPPAA statutory framework precludes

the return to Mar-Can of the escrowed payments pending disposition of the Old Plan's appeal, I

turn to its request for a stay pending appeal under FRCP 62.  The Old Plan argues that the Court

should apply the traditional four factors set forth in *Nken*. (*See* Old Plan's Mem. at 4, 8-9; Old Plan's Reply at 7-9.) Mar-Can contends that the Old Plan is incorrect because the Old Plan seeks a stay of a monetary judgment, which is governed by the supersedeas bond requirements of FRCP 62. (*See* ECF No. 284 ("Mar-Can's Opp.") at 12-13.)

I agree with Mar-Can. The judgment here is akin to a monetary judgment and not like an injunction or a request for other equitable relief. *See In re Bakery & Confectionery*, 2013 WL 12444540, at *1 (judgment requiring that "defendants calculate and pay benefits to plaintiffs pursuant to the terms of the pension plan . . . to the date of judgment, plus pre-judgment interest" was "monetary in nature"); *Frommert v. Conkright*, 639 F. Supp. 2d 305, 310 (W.D.N.Y. 2009) (fundamental question in determining whether a judgment is monetary in nature is "whether the monetary value of the judgment can be calculated and secured with relative ease"); *cf. Korea Shipping*, 811 F.2d at 126 (finding no appellate jurisdiction because "the district court was not exercising its equity powers when it issued the payment order, but acting instead in accordance with a statute that it believed granted a right to preliminary relief"); *Bowers*, 719 F. Supp. at 171 ("A Court does not draw upon its equitable powers when ordering interim withdrawal liability payments, but merely enforces a statutory right granted to plan sponsors by Congress."). Thus, the proper factors to consider are those adopted by the Second Circuit in *Nassau*. *See* 783 F.3d at 418.[12]

---

[12]  While there is some conflicting case law regarding whether the Court must first consider the traditional stay factors before determining whether to waive the FRCP 62(b) bond requirement, "there is a more significant and recent body of case law interpreting Rule 62[b] as entitling an appellant to a stay as a matter of right upon posting of a supersedeas bond or upon the court's waiver of the bond requirement where the appeal is taken from a monetary judgment or its equivalent." *Conte v. Cnty. of Nassau*, No. 06-CV-4746, 2015 WL 13720237, at *2 n.1 (E.D.N.Y. June 4, 2015) (collecting cases).

But the Old Plan has not – even in the alternative – addressed those factors, or whether the Court should waive the supersedeas bond requirement under FRCP 62(b). "The Court is not responsible for developing arguments on a party's behalf or addressing conclusory claims." *Chiu v. American Yuexianggui of Li LLC*, No. 18-CV-5091, 2021 WL 4482656, at *3 (E.D.N.Y. July 26, 2021), *report and recommendation adopted*, 2021 WL 4480736 (E.D.N.Y. Sept. 30, 2021); *see Spectrum Ne., LLC v. City of Rochester*, No. 21-CV-6453, 2022 WL 787964, at *4 (W.D.N.Y. Mar. 15, 2022) (declining to address party's contention where party did "no more than invoke a proposition," without "meaningfully explain[ing] its argument, cit[ing] any applicable legal authority, or apply[ing] said authority to the present dispute," as it "is not the Court's responsibility to develop the [defendant's] scattershot assertions into discernible legal arguments"). As such, I decline to construe the Old Plan's motion as requesting a waiver of FRCP 62(b)'s supersedeas bond requirement.

In any event, the Old Plan's motion for a stay also fails under the traditional factors. "It is well established that the first two factors [– likelihood of success on the merits and irreparable injury to the applicant –] are the most critical, and that both must be satisfied to warrant a stay." *Carnegie Institution of Wa. v. Fenix Diamonds LLC*, No. 20-CV-200, 2024 WL 3012037, at *1 (S.D.N.Y. June 13, 2024). Here, the Old Plan has not attempted to articulate why or how it will succeed on the merits – let alone made a "strong showing," *Nken*, 556 U.S. at 434, that it will. To be sure, the Old Plan highlights the conflicting interpretations of § 1415(c) in *Hoeffner v. D'Amato*, No. 09-CV-3160, 2016 WL 8711082 (E.D.N.Y. Sept. 30, 2016), and in the March 22 Decision that the Second Circuit will need to resolve. (*See* Old Plan's Mem. at 8; Old Plan's Reply at 8-9.) But the Old Plan does not argue why the Second Circuit will agree with the Old Plan's interpretation (in alignment with *Hoeffner*), and the mere existence of conflicting

interpretations, without more, is not sufficient to show a strong likelihood that the Old Plan's

preferred interpretation will prevail.  *See Carnegie*, 2024 WL 3012037, at *1 (concluding

applicant failed first factor where it did not attempt to argue why it will succeed on the merits);

*Strougo*, 194 F. Supp. 3d at 233 ("demonstrating likelihood of success on the merits requires

more than a mere possibility of relief").[13]  Thus, this factor weighs against granting a stay.

But even if the Old Plan did show a likelihood of success on the merits, it does not

explain how it would suffer irreparable harm if the Court ordered the return of the escrowed

payments to Mar-Can.  *See Carnegie*, 2024 WL 3012037, at *1 ("Carnegie cannot explain how a

monetary judgment imposes an irreparable harm."); *In re Citibank August 11, 2020 Wire*

*Transfers*, No. 20-CV-6539, 2021 WL 1905002, at *4 (S.D.N.Y. May 12, 2021) ("[I]t is well

established that, in general, an injury compensable by money damages is insufficient to establish

irreparable harm.").  The Old Plan has provided no evidence suggesting that Mar-Can is

financially unstable,[14] and its conclusory and speculative claim that "there is a real danger that

---

[13] Alternatively, "a party seeking a stay may satisfy the first factor – likelihood of success – by showing that there are serious questions going to the merits of the dispute and that the balance of hardships tips decidedly in its favor."  *Munoz v. Jamaica Builders LLC*, No. 23-CV-78640, 2023 WL 8252039, at *3 (E.D.N.Y. Nov. 29, 2023); *see Sutherland*, 856 F. Supp. 2d at 640-41 (S.D.N.Y. 2012) ("[I]f [appellant] shows serious questions going to the merits of its appeal as well as irreparable harm, [a] stay may be granted if the balance of hardships tips decidedly in favor of the moving party.").  The split in authority may constitute a serious question as to the merits, *see Variscite NY Four, LLC v. New York State Cannabis Control Bd.*, No. 23-CV-1599, 2024 WL 406490, at *13 (N.D.N.Y. Feb. 2, 2024), but I do not find a balance of hardships tipping decidedly in the Old Plan's favor.  The money is in escrow and not available to the Old Plan anyway, and as more fully discussed below in connection with irreparable harm, there is no indication that the Old Plan could not be made whole if it succeeds on appeal.

[14] Mar-Can has been simultaneously paying into escrow and contributing to the New Plan for the past several years.  (*See* ECF Nos. 65, 213-6, 213-13, 212 ¶¶ 13-18; *see also* Docket Entries dated Mar. 18, 2021, April 22, 2021, July 29, 2021, Oct. 28, 2021, Feb. 11, 2022, Aug. 5, 2022, Feb. 2, 2023, Nov. 8, 2023.)  The fact that Mar-Can has been double-paying – for its withdrawal liability to the Old Plan and for its monthly contributions to the New Plan – suggests

these assets could be dissipated and not collected by the Defendant after the disposition of the appeal," (Old Plan's Mem. at 8), does not amount to the type of harm that is sufficient to satisfy the second factor, *see CRP/Extell Parcel I, L.P. v. Cuomo*, 394 F. App'x 779, 782 (2d Cir. 2010) (summary order) (no irreparable harm shown where plaintiff "adduced nothing more than conclusory assertions" in support of claim that defendant might spend escrowed money and later become insolvent); *JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 79–80 (2d Cir. 1990) (no irreparable harm despite defendant not segregating disputed funds where no evidence that defendant would be unable to satisfy possible judgment); *see also Daspin*, 557 F. App'x at 48 ("[T]he harm must be truly imminent, and not mere possible injury, or remote and speculative injury."); *Fed. Trade Comm'n v. Shkreli*, No. 20-CV-706, 2022 WL 1210834, at *4 (S.D.N.Y. April 25, 2022) ("The party seeking the stay has the burden of showing 'injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation.'") (quoting *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011)).

To the extent the Old Plan relies on *Wells Fargo Bank, N.A. v. ESM Fund I, LP*, No. 10-CV-7332, 2012 WL 3023997 (S.D.N.Y. April 3, 2012), *report and recommendation adopted*, 2012 WL 3023985 (S.D.N.Y. July 24, 2012), to justify a finding of irreparable harm, (*see* Old Plan's Reply at 9), that reliance is misplaced.  In *Wells Fargo*, the court concluded that distributing the roughly $150 million in escrowed funds to the certificate-holders of a mortgage trust presented a real risk that the stay applicant would be unable to recover its funds due to potential collection issues, such as whether clawing back the distributed funds would be effective or whether the applicant would need to wait for several years so that additional funds could enter

---

that its financial situation is strong.  In any event, there is nothing in the record indicating otherwise.

the trust and be disbursed to the applicant through waterfall payments. *See* 2012 WL 3023985 at *2-3. The Old Plan points to no similar concerns here, where the escrowed funds would be returned to a single entity – Mar-Can – without the additional collection concerns at play in *Wells Fargo*. And while the Old Plan is correct that the failure to make interim withdrawal liability payments is irreparable harm, (*see* Old Plan's Reply at 9), that is not the case here as the parties agree that Mar-Can has made all its interim payments, (*see* Old Plan's Mem. at 2-3; Mar-Can's Opp. at 14). Thus, the Old Plan has not made the requisite strong showing of irreparable harm here, and this factor also weighs against a stay.

In sum, based on the two most critical factors, the Old Plan has not met its "heavy burden." *See Vista Food Exch.*, 2019 WL 6498068, at *1; *Nat. Res. Def. Council*, 884 F. Supp. 2d at 122. "Inasmuch as [the Old Plan] cannot show that [it] is likely to succeed on the merits and that [it] will be irreparably harmed absent a stay, the balance of factors weighs against granting a stay; [I] need not address the remaining factors." *Daspin*, 557 F. App'x at 49 (citing *Nken*, 556 U.S. at 435). Thus, the Old Plan's motion for a stay pending appeal is denied.

### C. Stay of Application for Attorneys' Fees

The Old Plan argues that the Court should exercise its discretion and stay further briefing on Mar-Can's request for attorneys' fees until the Second Circuit decides the pending appeal. (*See* Old Plan's Mem. at 10-12.) The Old Plan contends that because the Second Circuit could find in its favor on appeal, deferring the application would conserve the Court's and the parties' resources. (*Id.* at 11-12.) While Mar-Can recognizes that the Court has discretion to do so, it opposes additional delay, contending that the Old Plan is unlikely to prevail on appeal and that the majority of the attorneys' fees incurred in the litigation were incurred before litigating the interpretation of § 1415(c). (*See* Mar-Can's Opp. at 17-19.) Moreover, Mar-Can contends that

delaying is not harmless because "it is important to adjudicate fee applications 'while the services performed are freshly in mind.'" (*Id.* at 19 (quoting *Tancredi*, 378 F.3d at 227).)

I conclude that deferring ruling on Mar-Can's motion for attorneys' fees "will avoid the necessity of a second motion seeking the fees associated with litigating the appeal, and, in the event [Mar-Can] is the ultimate prevailing party, it can seek appropriate interest on the fee award." *Philadelphia Indem. Ins. Co. v. Cent. Terminal Restoration Corp.*, No. 16-CV-280, 2017 WL 3431404, at *2 (W.D.N.Y. Aug. 10, 2017) ("delaying resolution of [defendants'] request for attorneys' fees until [plaintiff's] appeal on the merits has been decided is the more prudent course of action"); *see Barrella*, 56 F. Supp. 3d at 172 ("In the typical case, deferring a ruling on a motion for attorneys' fees until the Second Circuit resolves a merits appeal ensures that the Court only has to address the motion for attorneys' fees by the party that ultimately prevails."). If the Old Plan were successful on its appeal, it would moot Mar-Can's fee motion because Mar-Can would no longer be the "prevailing party" entitled to attorneys' fees under § 1451(e), *see Mar-Can*, 2024 WL 1250716, at *16, and because Mar-Can's anticipated fee motion turns "on which party is the prevailing party for purposes of entitlement to fees and costs, it is clear that the resolution of [the Old Plan's] pending appeal on the merits could potentially impact the Court's determination of the fee motion," *Topps Co., Inc. v. Koko's Confectionary & Novelty*, No. 16-CV-5954, 2020 WL 6082093, at *2 (S.D.N.Y. Oct. 15, 2020).[15] Thus, I will

---

[15] The Court recognizes that delaying ruling on Mar-Can's motion for attorneys' fees "would preclude possible consolidation of [the Old Plan's merits] appeal with an appeal of an order of this Court on fees and costs, and could produce piecemeal appeals, which are disfavored in this circuit." *Mhany Mgmt. Inc. v. Inc. Vill. of Garden City*, 44 F. Supp. 3d 283, 286 (E.D.N.Y. 2014). But as Mar-Can concedes, "it is difficult to predict whether that factor weighs in favor of hearing [Mar-Can's] motion now or later, because it is unclear whether the attorney fee motion would be decided in time to be consolidated with the pending appeal, or would be the

defer ruling on Mar-Can's motion for attorneys' fees, and Mar-Can shall make its motion, if it ultimately is the prevailing party in the Second Circuit, within fourteen days of the entry of the appellate mandate on this Court's docket. *See Topps*, 2020 WL 6082093, at *2; *Matsumura v. Benihana Nat. Corp.*, No. 06-CV-7609, 2010 WL 1783552, at *1 (S.D.N.Y. Apr. 23, 2010); *Matsumura v. Benihana Nat. Corp.*, No. 06-CV-7609, 2014 WL 1553638, at *6 (S.D.N.Y. Apr. 17, 2014); *see also Sprague v. T.C. Inn*, No. 319-CV-1263, 2021 WL 4901494, at *2 (N.D.N.Y. Oct. 21, 2021) (collecting cases where courts within Second Circuit have denied motions for attorneys' fees pending resolution of merits on appeal).

## IV.    CONCLUSION

For the reasons stated above, Defendant's motion for a stay pending appeal is DENIED. Defendant's motion for a stay of Plaintiff's motion for attorneys' fees is GRANTED. If Plaintiff is ultimately the prevailing party, Plaintiff may make its motion for attorneys' fees within fourteen days of the entry of the appellate mandate on this Court's docket. The Clerk of Court is respectfully directed to return to Plaintiff its escrowed payments paid into the Court's Registry, with accumulated interest. The Clerk of Court is also respectfully directed to terminate the pending motion, (ECF No. 277), and close the case.

---

subject of a second appeal." (Mar-Can's Opp. at 19-20.) Given the other considerations, and that this factor is neutral at best, I conclude that deferring a ruling on the motion for attorneys' fees is the more prudent course of action. *See Mhany Mgmt.*, 44 F. Supp. 3d at 286. Further, I am not particularly concerned about adjudicating the motion while the services performed are fresh in mind, because I trust that counsel have been keeping contemporaneous billing records, as required in this Circuit. *See Marion S. Mishkin L. Off. v. Lopalo*, 767 F.3d 144, 149 (2d Cir. 2014); *Cruz v. Loc. Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1160 (2d Cir. 1994).

**SO ORDERED.**

Dated: August 21, 2024
　　　White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.